Yes, may it please the Court, I'm Kerry Sandman. I'm here with my co-counsel Amy Kraus on behalf of Mr. Styers. I'd like to touch on a couple of the issues today, the Clemens issue and also the ineffective assistance of counsel issue. As you know, in the Federal District Court, Mr. Styers asserted the claim that he was denied his rights under the Eighth Amendment and under the Clemens Supreme Court's decision in Clemens to an appropriate re-weighing of the sentence. And the District Court held that claim was not exhausted. The District Court believed that Mr. Styers had not exhausted that claim within a motion for rehearing that Mr. Styers had filed after his direct appeal decision in the Arizona Supreme Court. We disagree with that District Court decision. Suppose we agree with you. Do we remand to the District Court for it to do a re-weighing, which is constitutionally mandated, or can we do that ourselves without a remand? I believe that the only court that can ultimately do the re-weighing, according to the Clemens decision in Richmond v. Arizona, Stringer v. Black, all those Supreme Court cases tell us that the re-weighing actually has to be done in the state court. And the Arizona Supreme Court would have the choice to either do the re-weighing itself or, if it's so selected, it could remand to the trial, to the actual sentencing court, for that re-weighing to occur. But the District Court- But hasn't it done the re-weighing already? Well- I mean, the Arizona Supreme Court has done the re-weighing and found that two aggravators, even knocking out pecuniary gain, and no mitigators add up to a death sentence anyway. They did make that decision. Of course, now we're going to the merits. We're leaving the exhaustion issue and we're going to the merits of our claim. And, of course, as to the merits of the claim, it's our position that, even though the Arizona Supreme Court said, at least twice in its direct appeal decision, it said, we have considered all the proffered mitigation. And then, of course, it said, it signaled that it had re-weighed, just as you've indicated, Judge Baer. The problem is that the Arizona Supreme Court also said some other things in its decision, and specifically with respect to the mitigation that we're most concerned about, which is evidence that Mr. Stiers had suffered from mental illness and certain neurological impairments. What the Arizona Supreme Court said, as it went through the various items of mitigation that Mr. Stiers had presented, when it got to the evidence of Mr. Stiers' mental impairments, it said that this could constitute mitigation in the right, in another, well, let me quote it, because I'm sure I'll get it incorrectly. What they said, and this is in ER 86, defendant also suffered from post-traumatic stress disorder prior to and around the murder as a result of his combat service in Vietnam. And this is the key quote. This could also, in an appropriate case, constitute mitigation. And then they cited to a case called State v. Bilkey. And when you read that case, that is a case where the Arizona Supreme Court did consider evidence of post-traumatic stress disorder as constituting mitigation, where that defendant actually had some, his psychiatrists were able to explain that his offense was caused by his illness. And after the Arizona Supreme Court said this could, in an appropriate case, constitute mitigation, it then said Mr. Stiers, two doctors, could not connect his condition to the offense. That's a nexus requirement. Yes, that's correct, Your Honor. And so what we have here is we have, on the one hand, the Arizona Supreme Court saying, we considered it all. Quite frankly, if that's all they said, I think that we would have to assume that that's exactly what they did. But when they, as they're going through the items earlier in their opinion, and they say, well, this is and this isn't, this is mitigation and this isn't, they also said that there was some other evidence that was not mitigation. We happen to agree with that. That had to do with whether Mr. Stiers' jury was given a felony murder instruction and the court said, well, that's not mitigation. In this case, we agree with that. But when they said that his mental illness could not be mitigation, now I think we know what they meant. When they said they considered all mitigation, you know, they considered it to determine whether which was in and which was out and which was relevant and which wasn't. Because they cited Belkey in that as a nexus case. Right. And then, of course, the respondents argue, well, the Arizona court does not apply a nexus test. And, of course, forgetting about what they did in any other case, they certainly applied a nexus case in Mr. Stiers' case. And we know, going all the way back to Eddings, and as we're reminded in Tenard and Smith more recently, you know, the nexus test is not a test that the U.S. Supreme Court is happy with. And they've had to admonish courts recently not to apply it. Mr. Sandman, does it matter with your argument that Mr. Stiers denies doing the act, being the trigger man? Does it matter to? Does it matter at all? He denies. Somebody else shot him. He didn't shoot him. The other guy shot him. Isn't that his statement? That was his statement, Your Honor, that it's correct. All right. So if he admitted shooting him, then your statement about the mental illness, possibly mitigating it, might be looked at in one way, when he denies shooting him and we look at the record. Right. Does it matter? Yes. And I'll tell you why. First of all, the jury said that he did commit the murder. They didn't believe Mr. Stiers. Yes. And the Supreme Court didn't believe him, and they said he committed the murder. Yes. And what I would say, if I was representing Mr. Stiers either at the trial or before the U.S. Supreme Court, is I would say, okay, you made the finding. He did it. Now let me tell you why I think you should show him mercy. And the U.S. Supreme Court says I'm entitled to do that. And I would talk about his life from the time that he went to Vietnam through the time of the offense, and we would talk about things that, at least the Supreme Court has said, that the sentencer should be able to at least consider in deciding whether to show mercy. Now, they don't have to show any mercy. In fact, they don't have to give that evidence very much weight. But what the U.S. Supreme Court has said over and over and over again is give it as much weight as you want, but you can't exclude it from your consideration. Now, if we are going to have a system of capital punishment, at a minimum, certain things have to be let into the door, so to speak. So I think it matters no matter what. And, you know, the Supreme Court of Arizona had an opportunity in the Hoskins case, which I quoted to the court in the briefs, where they explained exactly what they've been doing or were doing up until more recently. They, in Hoskins' case, they were explaining how they would apply this nexus test to Mr. Hoskins, who also had evidence of family dysfunction and mental illness. And they said that if the defendant fails to prove causation, the circumstance will not be considered mitigated. Now, of course, that's exactly what they said in Steyer's. And then they went on to say in Hoskins, if the defendant proves the causal link to the offense, then we'll determine weight, what weight to give it. And that's exactly what Eddings and Gennard and Smith say is not supposed to happen. And this was designed to be a perfect crime. If his buddy hadn't decided to confess, everything that Mr. Steyer's did was consistent with a very good scheme. Well, again, Judge, you know, if we had a proceeding under the Eighth Amendment where each side could present all of the evidence, I think that certainly the respondents would make that argument, and I think the Court would be entitled to give it great weight. Or they would be entitled not to give it great weight, depending on how they decide, you know, to, you know. How much weight do they want to give to the fact that Mr. Steyer's is impaired? Now, we, you know, that would be a choice for the Court to make. And what the Court said, the trial court in Arizona, was it elected to disregard the testimony of Dr. Thomas Thomas, two Thomases, one's enough, presented at the aggravation mitigation hearing. Do you interpret that to mean, A, that it didn't consider it because there wasn't any predicate evidence of nexus, or, B, it considered it, but we don't believe the man. Oh, I don't believe the man. And, Judge, I'm sorry, I've got to, there's some talking up the hallway. Were you talking about the state court, I mean, the actual sentencer, the trial judges? Yes. Yeah. As I recall the record, the prosecutor at the sentencing mitigation hearing actually called Dr. Thomas to testify, and I'm sorry I don't have it as clear in my mind, but it was the prosecution actually that called him to say something that was very harmful to Mr. Steyer's, and the Court rejected the state's proffer. Oh, I see. And so it wasn't a proffer that Mr. Steyer's was making about his illness. I misunderstood. I thought it was Dr. Thomas testifying that Mr. Steyer had PTSD. The answer is no. And, in fact, the only thing that really happened at the sentencing hearing was the Rule 11 competency reports were submitted to the judge. One of them is very detailed, and it's attached into the excerpt's record. But, no, that had nothing to do with it. I'm glad you put that up. I'd like to, if I could, turn my attention to the claim that Mr. Steyer's trial counsel was ineffective at trial when he failed to file a motion to strike the jury veneer after the voir dire in that case. And I think I'd like to address that in terms of, I think, three issues that are helpful to the determination of whether Steyer's counsel was ineffective when he failed to move to strike the veneer. The first factor, I don't know what he was thinking before he showed up at the trial. Apparently, he made a statement at the end of the jury questioning that he decided not to move to change venue because he thought it wouldn't matter. And he had talked to Mr. Steyer's, and they agreed they'd have a trial in Phoenix. Well, that's the best he could do. That's what his idea was. That's what he said. But I guess the point is when he finally showed up in the courthouse, whatever his strategy was before he arrived, he walked into the courthouse, and the first thing he finds out is that at least 90% of the people in the veneer know about the case. They've been exposed to pretrial publicity. And we know from looking at that pretrial publicity that it was extremely prejudicial to Mr. Steyer's. The second thing that happened at the end of the voir dire, when he should have been thinking about whether to pass that panel, was that he had permitted an extremely, and what I guess you can only characterize as inadequate voir dire, that I think couldn't have lasted more than 45 minutes to an hour, where there was no real probing of what the jurors had, how they were affected by what they had seen in the press and on TV and in the newspapers. And, of course, the trial lawyer submitted no voir dire questions. But you're not making your point on actual prejudice in the jury veneer. You're saying presumptive prejudice, right? Yes. So we don't really have to worry about the second point at all, right? Well, I think the lawyer's ineffectiveness itself and the adequacy of the voir dire really prevents me from showing actual prejudice. I mean, the only way I could show actual prejudice is on a record where people are asked questions and they give answers. So you're right, Judge Bailiff. We have to try to make an assessment of what happened based on presumptive prejudice. But the judge was pretty careful in saying that everybody who raised his hand and had an opinion, he asked them three questions. One, are you sworn? Two, what's your opinion on? Three, can you set aside that opinion and decide the case on the evidence? He practically used the same words over and over again. I went through and I counted about nine of those questions. What's wrong with that? And every time anybody said anything like, I think I may have a problem or I may not be objective, he was gone. Certainly there was nothing wrong with excusing those jurors who said they had opinions. Nothing wrong with having to excuse them. Nothing wrong with the questions from the judge. Yes, when the judge addressed the individual jurors, and he did address some of them, as some were excused and others were brought on, he did ask them specific questions. And with respect to those jurors or those members of the veneer, the judge, I would concede, could make probably a sufficient assessment of that juror's demeanor and, you know, I'm getting a little out of it. What I mean to say is those jurors who were asked that question and said, I don't have an opinion. And there were some of those. They said, I have no opinion. And they told the judge face-to-face, I think I can decide the case fairly. I would agree with you that as to those jurors, the judge could make a credibility and demeanor determination. But not everybody was, you know, there was a group of jurors that were not asked that. They were asked sort of, I guess, just as members of the veneer sitting in the courtroom, they were asked the general question, could you decide the case based on the evidence? But he had no ---- Well, no, no, no. He asked that of every individual juror. The way it went, as I read the transcript, was he first of all asked, have any of you heard about the case? Everybody raises his hand, 90 percent, virtually everybody. And then as to those who had opinions, he asked, do you have an opinion about the outcome of the case? And there were some people who raised their hands. As to those people, he went one by one and asked them to put aside or set aside a question, and can you decide the case on the evidence question. He did do that. That's correct. So what's wrong with that? Nothing wrong with that. But there's one thing. You have to add another factor, too. What happened when he discussed it with Stiers? What did Stiers tell him, his lawyer? When Mr. Stiers spoke to his lawyer, that was about whether to change venue. And what did he say? And according to the attorney, they agreed, lawyer and client agreed, that they would not move to change venue. I don't want to quote with exact language when I'm inexact, but something to the effect of I want to proceed. I want this trial to proceed. Let's get on with the trial. Wasn't that roughly his client's position? Well, I did not interpret that dialogue that way, Judge. But I thought that what the lawyer was doing was papering the record to, because he said, because there's going to be, he qualified it, and I'm not as good at remembering the specifics as he is either. But he said, because there may be questions later, I want to tell you that before we came here, this is again before the board diary and before everything that happens in the courtroom occurred, he says, Mr. Stiers and I talked about whether to change venue, and we decided not to and to proceed. So I understood that to explain why they showed up that day without making a motion to change venue. And I would like to just answer Judge Baez's question, because Ms. Krause, I had her spending hours and hours with that transcript, that tiny little transcript. But out of the original people that raised their hands out of the first 36, the only ones in that group that the judge individually questioned were the nine who raised their hands. The other group of them who did not raise their hands, they were not individually questioned by the judge about, you know. Raised their hands in response to which question? They raised their hand in response to the judge's first question, how many of you know about this case? No, no, no. They also kept their hands up if they had an opinion. Right. That's the answer. That's the question he was asking. Right. You have an opinion. Will you be able to set it aside and decide this case on the evidence? And many of them said no, and they were excused. Some said yes, and some volunteered. I couldn't be objective. Yeah, but as to those who answered Judge Krasinski's questions, first he said, how many know about it? And then he said, okay, of those, how many have opinions? And then, but those who did not self-admit opinions, who had also seen press, they were never questioned individually. So, you know, that, and six of those people who were never questioned individually ended up on the jury. And all 12 of those people that ended up on the jury sat in that courtroom for probably 45 minutes when what they, you know, predominantly what occurred during that 45 minutes was veneer after veneer after veneer saying, based on what I've seen in the press, I can't be involved in this case. I have an opinion, and the district court, I think, got it right there when he said, these people were basically telling everybody else in the room that Mr. Stires was guilty. That was their opinion. And so you have six of the eventual jurors who are not individually questioned by the judge. And you have, it's just a remarkable, you know, really, in a first-degree murder case that's bound to be a capital, you know, where there's a significant risk of a death sentence, the ABA guidelines, you know, say the lawyer should come in prepared to make probing inquiries of the veneer. And this guy does absolutely nothing. And the Arizona court procedures. What is it that you think he should have done? I mean, you claim he wasn't effective in what he did do. Well, I think that he should have, number one, asked for individual voir dire. The Arizona procedure, Arizona cases say that in a case like this, where there has been this type of press coverage, inflammatory press coverage, that the lawyer should ask for that and has a right to get it. This would have meant that there are no general questions at all. Every juror gets questioned individually. Right. And the Arizona court actually, the Arizona Supreme Court, is much more liberal than the U.S. Supreme Court in this area. For example, in the Miu Minh case, the U.S. Supreme Court said no content questioning. The Arizona Supreme Court says you can have content, you know, it's reversible error not to allow those types of questions. So this lawyer had all sorts of ammunition. And I'm sorry, that case had been decided by the time of trial? The case that I think that's ‑‑ I don't believe that case had been decided by the time of trial, but Rule 18.5, as it existed at the time of trial, said that, you know, it's these cases where there are prejudicial publicity that you should allow individual voir dire. But you're right, Judge. The case where the court said you should allow content questioning came after Mr. Starr's trial. And what about the case that said you're entitled to individual questioning of the panel? Had that been decided? I think both those cases actually came after. I'd have to ‑‑ So in judging the competence of counsel or the effectiveness of counsel, my understanding of this thing, I mean, questioning of jurors varies significantly among courts, how jurors are empaneled and who asks the question, whether the lawyers get to ask questions, the judge does it, and how much ‑‑ I think this was a regime where there were no individual questions allowed. The lawyers didn't get to question the jurors. It was a judge who, sort of the way we do it in the federal system. Yes, the Rules 18.5 at the time of the trial said that the court will conduct voir dire. But the commentary to the rule said that there should be ‑‑ individual voir dire would probably be appropriate in cases where there's prejudicial pretrial publicity. But that doesn't ‑‑ but, Judge, that doesn't stop the lawyer from submitting voir dire questions and making, you know, attempting to have the court ask questions that will be probing of ‑‑ No, it doesn't stop him, but it's also, you know, there's only so much a lawyer can do if the questions have to be filled to the judge. And what I'm trying to assess here, you know, you give me these cases that are decided later, and they say, well, there's later authority that says they were entitled to individual questioning, there are later authority that, you know, for various rights that defendants have to have questions posed to the jury. And I'm just ‑‑ but we have to put ourselves back to the time of trial and the laws that stood then. And I'm just trying to visualize what it is the lawyer thought he could reasonably do without taking off the judge and still have some sort of hope of getting something accomplished. Just making motions and saying, here, do this, or let me suggest questions, is not an effective tactic if they have no likelihood of succeeding. And I don't have any good feel at all for what the atmosphere is. I mean, take federal courts, for example. We ‑‑ okay, we ‑‑ district judges differ significantly, but by and large the tradition has been that the district judge asks questions and doesn't have to accept any questions from the lawyers and allow individual voir dire or anything of that sort. And I'm just sort of wondering. I mean, you could say the lawyer could have done all sorts of things, but what would have been the result? Do we have any cases where lawyers have done stuff like that and succeeded? You know, I think ‑‑ I agree with ‑‑ I understand what you're saying. And I think maybe I've taken you down the wrong path because ‑‑ and I don't have cases. And I think you've identified a sort of a quandary that I don't think this court has to decide. And so let me put it, frame it this way. I mean, I think at bottom this is not really ‑‑ it came about what he should have been doing in terms of voir dire and asking questions and forget about all that because I think it takes you to the concern that you have, Judge Kaczynski. I think what we're saying, though, is after all these people come in and say they've been exposed to something very prejudicial and 27 of them get up in the room and say, I think Mr. Starr is guilty and they do that in front of everybody. I think that any competent lawyer at that point would have said, now, wait a minute, Milky's trials just ended two days ago. You know, Judge, what about continuing this for 90 days? What about strike ‑‑ I mean, our claim is a motion to strike the veneer. That's at bottom. You know, forget about everything else he didn't do or could have done or maybe theoretically could have done. Maybe he couldn't have done any of those things as you point out, Judge. Once all this unfolded in the courtroom, you know, he should have said, let's start over. Judge, I mean, at that point he can say to the trial judge, Judge, look, everybody knows about this case. We've got to get a different panel in here and we've got to ask maybe some better questions and we've got to do ‑‑ you know, he should have moved to strike this veneer after almost a third of the people had gotten up and said that Mr. Stires was guilty during the selection process. You know, it strikes me that that's the tactic least likely to have a positive result. I can certainly see sort of standing up or submitting questions ahead of time and saying, Judge, consider these questions, and the judge might or might not. I can see saying, look, so many people have raised their hands. I think the judge should do individual questions. All these things we've been talking about. I don't know what effect it would have, but I can certainly see somebody doing something like that. But I know of few cases, if any, where judges start a trial. They've got a jury out there in panel. This isn't a situation where the defendant gets sick or, you know, the prosecutor's got a death in the family or something and has to leave for a few. You know, a situation like that arise where you have an emergency in the day of trial and the court might say, well, put it over a day or two. But where the court says, well, I'm just going to fold up the tent and we're not going to try this case. It just doesn't resonate with me as a kind of thing that a judge would do or that a lawyer would reasonably expect a judge to do. And I would say to this judge, the only time I think a court would have to sit up and pay attention and do what I'm saying is if the court found there was what we call in the vernacular prejudicial publicity. If you found that the trial. Isn't that the circus atmosphere standard? No, it isn't, Judge. I mean, that is, this court explained that in Daniels very recently, I think in 2005. It really has to do with whether it's really an assessment of the type of exposure that the jury has had to publicity and whether having been exposed to extremely prejudicial publicity, they can be expected to be fair and impartial jurors. And when the court presumes prejudice, the answer to that is no. But we're not allowed. You've got three cases. You've got Shepard, you've got Irwin, Irvin, and Rideau, where prejudicial publicity was presumptive and shown to be so. And then you've got Murphy coming along and saying these cases cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior conviction or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. Doesn't that sort of rein in those 1960 cases about presumptive prejudice? Oh, I agree. Yeah, and the Patton v. Young is the same, Judge. But what Murphy and Patton turn on, they look at the publicity, but then they also looked at when was that publicity. And both in Patton and in Murphy, in Murphy it was most of the publicity was seven months before the trial. In Patton it was about a year and a half before the trial. You've got a few months problem here, too, don't you? No, we have two days. You have December articles, and then you have seven months, and then you have the September articles after Mielke's case. We have a spate of articles during the Mielke case. So we have articles coming right up on that. But, in other words, the court in Patton and in Murphy didn't you're right. They said, look, publicity is not enough. They also looked at the voir dire in those cases. I think the voir dire in Patton went on for 14 days and covered like 8,000 pages. And they read all that, and they said, you know, the jury you got, despite all that publicity, you got a fair and impartial jury. And they were able to determine that by looking at a very extensive voir dire, both in Patton and in Murphy. And you're right. The court wasn't willing to say, in those cases, we're just going to look at the press articles. We've sort of exhausted your time. But on the question of deficient performance and failing to move to dismiss the panel, are you moving, are you standing solely on presumptive prejudice, or are you also claiming actual prejudice? And the latter, are there any affidavits from any of the jurors that say we went into the jury room and we discussed the pretrial publicity, we didn't pay attention to the evidence? No. I think that in this case, the evidence of presumptive prejudice comes from the content of the press articles and from what happens in that jury room, when almost 100 percent of the people that come in there say they know about it, and then 27 of them get up and say they have opinions of Mr. Steyer's guilt. There's cross-contamination of that panel. And we're saying that, as a whole, creates presumptive prejudice. Thank you. And I'm sorry I didn't get a chance to talk about EDFA. But we're at your brief. Okay. We'll hear from the State. And I meant with respect to that particular issue, Judge, the EDFA on the ineffective assistance issue. We'll give you a little time for rebuttal. May it please the Court. My name is Jeff Zick. I'm an Assistant Attorney General in the Arizona Attorney General's Office. And I represent Appley in this matter. I'd like to start with one correction from the record or a clarification. At the end of Or Dyer, defense counsel stated to the court, it's at ER 1841, that he had just for the record, and this is a quote, as to the issue of, I discussed with Mr. Levy, the prosecutor, my client, the question of the issue of venue. And just so that there's no problem in the future, I discussed the possibility of requesting a change of venue due to the recent decision in Deborah Mielke's case with Mr. Steyer's. Mr. Steyer's wishes to proceed with trial. He also then went on to explain to the court that he did some research regarding other areas in the state of Arizona with respect to the publicity of Deborah Mielke's case and whether that would affect Mr. Steyer's right to a fair trial and indicated that, based on the Or Dyer and the jury selection that had just occurred, that he believed Mr. Steyer's received a fair jury or had a fair impanel jury. The court indicated from then that it believed the same thing. In addition, later on, at the post-conviction relief proceeding, when Mr. Steyer's raised this issue again, the trial court made a finding that he believed that the jury that was impaneled was fair and partial. So there's no question that Mr. Steyer's wished to proceed with trial at the time. He was present in the courtroom when that exchange occurred. The pretrial publicity in this case doesn't come anywhere near the inflammatory publicity that is in cases like Shepard and Rideau. I did identify Mr. Steyer as the trigger man. There were, I believe, my recollection from the record, three articles. I believe they came in September or October during Deborah Mielke's trial that said he was the alleged trigger man. For the most part, though, the articles, and I only want to focus right now on the articles that occurred during Deborah Mielke's trial, were primarily factual and reporting on what was occurring in her trial. Most of the articles indicated that there were other defendants, Scott and Steyer's, that were awaiting trial, that were going to be tried after her case. But for the most part, they were factual renditions of what was occurring in Deborah Mielke's case. In Daniels v. Woodward, this court decided a pretrial publicity case and found that the publicity in that case was highly inflammatory. I think this case, Steyer's case, is very distinguishable from that case. In Daniels, and I know an appellant relies on Daniels for showing that this pretrial publicity is inflammatory, but in Daniels, the pretrial publicity occurred immediately before the trial and months before. But I think in the court's opinion, it indicated that the media had treated the two victims, which were police officers, as posthumous celebrities. There were numerous articles regarding memorials that were built for the officers. I understand your argument, but I'm wondering if that really responds to what Petitioner's claim is. I don't understand Petitioner to be claiming that the jury was so tainted that you couldn't get a fair trial, which is sort of a separate kind of claim. His claim is, look, the lawyer could have done more to get a fair panel. And if he had done more, if he had asked for a change of venue, and I understand you've got something with the waiver issue, if he had asked, you know, once all those people raised their hands, if he had said let's postpone the trial, if he had said let's do individual questioning of jurors, you would have had a better winnowing and a sort of fair selection of jurors. I think that's the claim. And I don't think he has to show that this jury was standing by itself constitutionally, you know, sort of a, essentially a mob, for him to say, but a competent lawyer would have done more and would have brought it from where it was, which is a bunch of people in the court room, most of whom I've heard of, and then who said they're listening to, you know, fellow jurors or fellow veneer people saying, yes, I know, and I think this guy's guilty, to a situation where those would mitigate. That's his claim. And I think you're speaking to a different claim. You know, in talking about the cases where the jury panel itself was defective, you're really not answering the ineffective assistance of counsel claim. Well, to answer that. Why wouldn't a competent lawyer, I mean, you know, the question is asked, and almost everybody in the veneer raises his hand and says, yes, I heard about the case, and a whole bunch of people say, and I form an opinion that, you know, that I can't put aside. Why wouldn't a competent lawyer say, look, this is the kind of thing that ought to be done in private, single juror at a time, and let's also question the people who didn't raise their hands? In the context of trying this case in 1990, a reasonable lawyer, as was stated before, the practice in Maricopa County was it was the trial court that conducted Vore Dyer. Attorneys were not asking questions. But I gather attorneys could suggest questions. They could suggest questions, and I'm unaware of any questions suggested by defense counsel in this case. But there's no Supreme Court precedent indicating that counsel had to do, had to suggest questions or had to do anything with respect to doing anything different than this counsel did in Vore Dyer. The trial court did a proper Vore Dyer of the panel, of the entire veneer, to find those individuals who had formed fixed opinions and not allow them to serve on the jury. And he asked … Not even fixed opinions. Any opinions. Any opinions. Qualified and unqualified. He did get rid of anyone who had any opinion. And he was very careful in his selection or in his questioning to ensure that the entire veneer did not hear what those opinions were. I don't believe there's any requirement for counsel to ask for individual Vore Dyer, especially in 1990. Would it happen today? I don't know. Things are done a little different. Lawyers do ask questions now in Maricopa County. But at the time, it was trial court conducted Vore Dyer. So there really isn't any precedent that an appellant can show this court that requires counsel to do anything different than what this defense counsel did. With respect to the F6 aggravating factor, and I would like to discuss Judge Bea's question, the first question, I believe it was, whether this court remands this case to the district court for a re-weighing or to the state court. With respect to this particular issue, if you get to the merits of the issue, the appellant has couched this argument as a Tanard violation, that Arizona somehow has a causal nexus requirement for all relevant mitigation. The state believes that that's an inaccurate assessment of Arizona's death penalty scheme. There is language in Arizona State cases talking about causal nexus. It goes to the weight to be given to that particular mitigating circumstance. Right. But you're really not answering Judge Bea's question, which, if you will recall, was assuming we get to that point, who do we remand to? Now, you're taking Judge Bea's question and answering the very thing that he said he's not asking. I'd be interested to know what your answer is to the question he did ask. And I apologize for that, Judge Kuczynski. I was giving some background argument to my final answer is, no, you don't need to remand to the district court. There's no authority for that. And, in fact, this court does not need to remand the case to the state court, either the Arizona Supreme Court or any state trial court. Will you just vacate the conviction and let them walk? Is that what you're saying? No, no, no, no. I'm not saying that. What I'm saying is you remember the what if. What if we conclude that the state court improperly failed to weigh? And your answer is we don't re-weigh ourselves, we don't have a district court re-weighed, and we don't send the state court to re-weigh. It's the only remaining possibility is we just let them walk. So is that your position? No. Okay. So if we don't let them walk and we have concluded that they improperly failed to re-weigh, what are the other possibilities? Have I missed some other possibility? I didn't say you couldn't re-weigh. This court couldn't re-weigh. And that's what my answer is. We re-weigh. Right. Under Brown v. Sanders, you can look at the invalidated aggregating factor and the facts supporting that invalidated aggravating factor and determine whether those facts could be used or considered by the trier of fact on the valid remaining aggravating factor to determine whether there's harmless error. And that's my answer. And I apologize for trying to go through an argument or background to get there. We're to look at the evidence that invalidated the aggravating factor? Because I never understood the Arizona Supreme Court as to why they struck that aggravating factor. I don't know that they did on any evidence. They just said that the explanation for the life insurance or the denial of the life insurance could be interpreted on the one hand as the life insurance as a motivation for murder, and the denial of it could be an attempt to deflect suspicion. And therefore, since there were both of those inferences available, then you couldn't prove motivation for pecuniary gain beyond a reasonable doubt. Frankly, if I've confused you in my relation of what the Supreme Court said, that's because I am terribly confused by what the Arizona Supreme Court said. And I probably confused you in that I was focusing on what if this court struck the F6 aggravating factor on senselessness and helplessness. Well, we can't do that. That's already been struck by the Arizona court. No. No, I mean the aggravating factor of pecuniary gain has been struck. Right. The F6 factor was not struck. And the claim here that Appellant is making is that the F6 aggravating factor is vague, facially vague, and there needs to be relief. You just jumped tracks. We were talking about the failure to consider the mitigating factor of post-traumatic shock. I thought that's what we're talking about. We're talking about aggravating factors now? Yes. No, I wasn't talking about the post-traumatic stress disorder mitigating factor. Okay. I may have been misremembering, but I thought that's what Judge Baer asked the question about. Assuming we consider that the state court did not properly weigh this, failed to weigh this mitigating factor, who re-weighs the factors at that point? And I thought that's what we're talking about, but maybe I was confused. Well, I was talking about the F6 factor, but no, I wasn't. I don't believe that was the question regarding it. Are you talking about senseless or depraved? Is that what you're talking about? Well, it's heinous, cruel, and depraved is the F6 aggravator, and you can prove the heinousness or depravity through the five Gretzler factors. And senselessness and helplessness are two of those factors. Well, we are on different tracks. Okay. The question I had in mind was this. There are two aggravating factors, the victim's use of what you call the F6, that remain in the case after the Arizona Supreme Court. Right. Arizona Supreme Court finds the mitigating factors are de minimis and don't weigh. Right. They weigh themselves. They don't remand for further weighing by the trial court. Right. Now, if the Arizona Supreme Court was correct in doing that, right, should they not have remanded to the trial court to do a complete reweighing again? Now they only have two instead of three aggravating factors. No, the Arizona Supreme Court would not need to remand to the state trial court for a reweighing because they did the reweighing in their independent review. Is that constitutionally permissible under our death penalty cases? Yes. And who says, what case says that? Well, Eddings allows and Clemens allows for the state supreme court to reweigh when they find or when they invalidate an aggravating factor. And in this case, the Arizona Supreme Court did a proper reweighing. They, what happened was they went through the mitigation that was presented or proffered and they considered it. Now they found some of the aggravation or mitigating factors did not meet the requirement. And there's two requirements in Arizona, not really requirements, but there are statutory mitigating factors that the defendant must prove. So Mr. Salmon dealt with that and then went on to point out some language that the Supreme Court of Arizona also used inside of the Bilkey case. Now doesn't that change the language of the Arizona Supreme Court saying we've considered all the proffered evidence? No. The Arizona Supreme Court considered all of the proffered evidence. And what they did in this case, in Stiers, they looked at his post-traumatic stress disorder evidence that he presented and they found that it was not connected to, there were no experts. Yeah, there was no nexus, which was clearly wrong. The Supreme Court of the United States says it's just wrong, just plain old wrong. So this is, I mean, here they say, right here, this is after citing Bilkey, they say, however, the two doctors who examined the defendant could not connect, could not connect the defendant's condition to his behavior at the time of the conspiracy of the murder. And this is exactly what the Supreme Court of the United States says you can't do, you can't discount, you can't refuse to consider a mitigating factor because there's no nexus to the crime. Case after case after case. So that's where you are. They make a big boo-boo there. No. No? No. I disagree with that. And in Hoskins, which is cited in the brief, it talks about the causal nexus. I don't want to call it a requirement, but the causal nexus showing that it goes to the weight of that evidence. Now, it would be improper for the court to say, well, we're not even going to consider it. It did consider it. And then it looked at whether there was any connection between that method and the same crime. Well, where did it consider it? Where did it consider it? It said, look, we weigh this, we find it too weak. What they said is there's no nexus. However, I mean, the only sentence they have in the whole opinion that deals, that sort of disposes of this factor, the two doctors who examined the defendant could not connect the defendant's condition to his behavior. Right. And that goes to what the, what Stiers was doing at the sentencing was attempting to prove the 13703G1 mitigating factor, which goes to the mental health. That doesn't mean that that evidence isn't considered as nonsensical. But it doesn't have to be a list of factors. Supreme Court has said you can have listed or unlisted factors. You have to consider mitigating evidence of any kind. State can't channel it to particular categories. Right. I agree with that. And Arizona doesn't do that. What I was trying to say is you have statutory mitigating factors that are there, but then you also have non-statutory mitigating factors that any evidence can be considered as. And that is what happened in this case. Show me where, I'm looking at the Supreme Court opinion now, and so you may be well advised to take it in your hand and look at it, and just show me where they say, yeah, we're considering, you know, what's weighing the post-traumatic shock PPSC, and despite this weighing we come out and decide in favor of the death penalty. Where do they say that? I think if you look at the paragraph above the independent review, which talks about what the trial court, because the trial court did not list each factor, each proper item. I'm sorry. Can you be a little more specific? Okay. It's the paragraph. It's on page 778 of the opinion. It's ER87. Okay. I'm looking at the ER87 right now. Yeah. Okay. And it's the paragraph above independent review. It does not specifically list post-traumatic stress disorder. Why don't you read me the first three words of that paragraph so we know. Because the trial court did not list. Okay. All right. Okay. So what is it that you find in this paragraph that helps you? This paragraph explains that even though the trial court didn't list the factors, it still considered them based on the Arizona Supreme Court's independent review. It also says, it is apparent that the trial court considered this evidence, but ultimately found that it was not sufficiently substantial to call for leniency. We will also consider it in our independent review. And if you look at, historically, Arizona's death sentencing scheme, the Arizona Supreme Court has always looked at mitigating factors not only as whether they need the test of the statutory mitigating factor, but also as a non-statutory mitigating factor. There are cases that talk about if a trial court finds that, say, for example, impairment does not rise to the level of statutory mitigating evidence, it must be considered. It must consider that offered evidence further to determine whether it in some way. Let me test what you just said. Can you look at the paragraph right above, the because paragraph? The one that started, there was a testimony to that? Yes. Look at the last two sentences of the paragraph. The defendant conspired to kill Christopher and then he killed him. The fact that the court gave a felony murder instruction is not mitigating here. You see that? I see that. Now, in the next paragraph, they say we will also consider it in our independent review. Now, do you think they also consider this factor in the independent review, the one that they say is not mitigating? Yes. I think in Arizona, they look, they review the entire record. This court has found in Comer v. Schreiro that Arizona's independent review is extremely thorough. They will look at all the longer evidence. So even when they say this is not a mitigating factor, they weigh it anyway? And that last sentence of the paragraph that I read, we will also consider it in our independent review, all proffered evidence. That's what independent review is. They consider all of the proffered mitigation. But they just said this is not mitigating. It goes into their calculus. Okay. That's certainly a possible leaving. Now, getting back to what I thought Judge Baer's question was, it may, in fact, have been, I seem to disagree with you on that point, and we think that, in fact, the State Supreme Court did not, in fact, weigh post-traumatic stress as a mitigating factor. What do we do with it? What do we do with the case? If they didn't consider post-traumatic stress disorder as a mitigating factor, under Brown v. Sanders, I think you can review for harmless error. Okay. And let's assume that we find that error is not harmless. Then it needs to be remanded. To whom? For resentencing if you find it's not harmless. To whom? We don't do it. The district court doesn't do it. So the district court would issue a conditional writ subject to 90 days for the state to reweigh or whatever, to go back and resentence. It would be a resentencing. Vacate the death sentence. It would be a resentencing. And then the state court could decide at which level it wants to do that. Okay. But in this case, Stiers did fully present his post-traumatic stress disorder through an expert who detailed all of his medical records. The trial court had the ability to look at that and determine whether that had any effect or what weight to give that particular mitigating factor. So if the state trial court did, but the Supreme Court didn't, what follows from that? Well, the You need both, don't you? The state Supreme Court did, in fact. Did you understand the what if part of the question? It's what if the trial court So what if presupposes that we're not going to consider the what if part. We're going to assume that to be the case and answer my question. Okay. So what if the state trial court did and the state Supreme Court didn't? You need both. You need the trial court to do it, and then you need a review by the Supreme Court. But if either of them fails to do it, then that's an unreasonable or incorrect application of Supreme Court law and will require a sentencing. Right. But in this case, if I could explain, the state Supreme Court did consider this evidence and gave it little weight. So there is a consideration. It's not like the Arizona Supreme Court simply said, whatever. It depends a great deal on how you read this paragraph that goes from page 86 to page 87 of the ER. You know, I've heard your argument. I've heard other sides of the argument. But that's what it hinges on, right? That's the language from the Supreme Court decision. But if you look at historically Arizona's independent review and its consideration of mitigating factors and But ultimately what matters is what they did in this case. Right. But what they did in this case must be read in the historical light that Arizona has always considered this causal nexus or connection to that evidence with respect to the statutory mitigating factor, but always considers it in the non-statutory  Okay. Thank you. Thank you. We may have a couple minutes for rebuttal since we used up your time. Just very briefly, this goes back to the Judge Bea's question again. You know, Stringer v. Black, Clemens v. Mississippi, Richmond v. Arizona, those are the trilogy of cases that answer your question. What if the State court strikes an aggravator and doesn't properly reweigh? What do we do? It must be remanded to the State court. In this case, that's the Arizona Supreme Court. That court will then decide whether it wants to reweigh or it wants to send it back to the trial court. It can do whatever it wants. Under Clemens, the State appellate court can reweigh if they want to or they can send it to the State court. Procedurally, we can't enter a judgment saying remand the case to the Arizona Supreme Court. All we do is affirm or reverse the district court. But we can't remand to the district court with instructions to grant the conditional writ. Absolutely. And this Brown v. Sanders case is not in the briefs that the respondents filed. And I can assure you that Brown v. Sanders did not overrule Stringer, did not overrule Clemens, did not overrule Richmond with respect to this issue that is in front of you. And finally, this Hoskins case can't be read the way my brother has indicated. It says, and I quote it in my brief, if the defendant proves the causal link, then we will determine weight, if any. So it very clearly says if it doesn't have the causal link, it gets no weight. And they cite a case versus State v. Wallace, which is a 1989 case which predates Mr. Steyer's case. And if you go read State v. Wallace, it says the same thing. So ultimately, Judge Kaczynski is right. We have to decide what the language in Mr. Steyer's case says. And they certainly said as clear as they could in his case, this is not mitigating. And then they cite the lack of nexus. I think with respect to the EFFA issues on the ineffective assistance of counsel claim, I think our briefing sufficiently explains that, and I would invite the Court to revisit the briefs on that topic. Thank you. Judge Asagi, we'll stand some minutes. We are adjourned.
judges: Kozinski, Farris, Bea